Our next case up is 412-0713, People v. Skinner. For the appellant, Andrea Lyon. For the appellee is Anastasia Brooks. I want to mention, counsel, that we ask counsel to be present a half hour early in the event that our schedule permits us to start early. It does today. You are both here and I want to thank you both for being here early and giving us the opportunity to proceed. Ms. Lyon, you may proceed. I want to start by saying, as you can hear, I have, I'm getting over whatever that yuck is everybody has. Yes. I'll do my best to be heard. Okay. I apologize if I'm… Thank you, counsel. Okay. Doing what Marco Rubio did during his speech. Yes. May it please the court. We are here on an appeal from a dismissal of a post-conviction petition that we filed on behalf of Shirley Skinner in Cass County. And I want to start introductorily by saying that I'm aware that this court and no court can order a perfect trial. And that we can't have perfect representation and that we can't have perfect juries. And some of the tenor of the prosecution's brief is that that's what I'm asking this court to do. And I'm not. I'm asking this court for a fair trial where reasonable investigation has been done and a jury is not willfully disobeying the orders of the court. And that's my way of introduction. I intend to argue these issues in reverse order, starting with ineffective assistance of counsel, if that's all right with the court. Sure. And then ending with the juror issues. And I seem, Justice Steigman, I hope you're going to forgive me, to have landed you with an issue of first impression. Okay. I know you're going to be mad at me about that. One of the things that is apparent in this case is that the trial court never dealt with the fact that the failure to investigate meant that the way that the case was handled was justified in a vacuum, absent information. If Mr. Knoll had made the decision to try this case on a reasonable doubt theory, having thoroughly investigated the case, having looked at the defense of dwelling, looked at self-defense, defense of others, defense, having interviewed the witnesses that we did, and made the choice, however much I or someone else might look at that choice and say, that's not the choice that should have been made. Under our law, we must defer to a strategic choice. But a strategic choice cannot be made in a vacuum. And interestingly absent from all of the court's findings below in dismissing this petition is even the least mention of a pretty big fact that you have to deal with if you're the defense in this case. That's the confession. They don't mention the confession. Pardon me, I'm sorry. Okay? At all. That is, the trial judge says, well, you know, trying it as a reasonable doubt, talking about there's no DNA in the gun, that's a strategic decision. And yet, how do you get past the fact that Mrs. Skinner told the first responders, I shot him. He shouldn't have come in here. She was hysterical. She was upset. She was all these things. And now we know that Mr. Watkins' car was still running at the time that the first responders got there. And that's an important fact because that argues not that somebody pulled up, you know, to do their visitation, pick up their child, park their car, go knock on the door, and is greeted by a barrage of bullets or one. But rather that it fits what the evidence circumstantially shows. She's injured. The wall sconce is down. She's bleeding. She's in hysterics. He's dead. The car is still running. All of those things would argue that this was, in fact, a case of self-defense, defensive dwelling from a tumultuous entry, et cetera. And the decision that was made need not be deferred to in the absence of information. You know, when I started talking about that you can't ask for a perfect trial, you can't ask for a perfect investigation either. And one of the questions my students ask me when we're doing the trial-level cases that we do is, where do we stop, Professor Lyon? You know, when have we done enough? And that's kind of a moving target. It's not clear when you've done enough, but it's pretty clear when you haven't done enough. And when you haven't done enough is to do the basics, which is to interview the basic witnesses. The eyewitnesses to the crime, the eyewitnesses to the immediate aftermath of the crime. These are basic things that should not be news to anybody. And that was not done in this case. The fact that the state talks about that, you know, the trial lawyer did an opening statement with a theory, and did a closing statement with a theory, is beside the point. Because the theory was based upon a lack of information. And it doesn't matter that he had a theory, however foolish it might have been, in my or somebody else's estimation, if that theory was not based on a thorough investigation. And this was not that. Trial counsel's failure to investigate this case robbed Mrs. Skinner of her constitutional right of effective assistance of counsel. And it meant that this jury did not hear a true and complete picture of what the evidence was. I'd like to move now on to, unless you have some questions? No, go ahead. I'd like to move on to the juror issues. Which is, oh my goodness, all kinds of new stuff to deal with. We have the new rule, 606B. What does that mean? How does that, you know, imply? What does that do regarding police law? And we have a situation where taking the well-pleaded facts as true, which is what this court must do, looking at a motion to dismiss, having been granted, is this fact that the jurors said that they considered the fact that Mrs. Skinner didn't testify and didn't present evidence as evidence of guilt, in spite of having been instructed not to do so, is that something that falls into juror misconduct or not? I was taken to task by my learned opposition here because I didn't cite any Illinois cases on this subject. That's because they don't exist. Believe me, I looked. And my students looked. And they looked again. There just isn't anything. Because it's extremely rare. We expect jurors to obey jury instructions. And generally speaking, they do. But the jurors told us here that they didn't. And so the legal question for your honors to answer is this one. Does this fall within extraneous information that the jurors considered or not? Why would it be extraneous? That's the question. And I would like to tell you that the answer is 100% clear. But that would be disingenuous, your honor. And I'd be uncomfortable doing that. Because the line between when you're getting into the deliberations and impeachment of the verdict because people have now had second thoughts or all those other kinds of things that the courts tell us not to do, and the line between when the jury is considering something that they've been told not to consider directly, where is that line? And that's a difficult question. In our estimation, this jury crossed that line. Because they considered as evidence something that wasn't evidence. It would be the same as if they had considered what color Mrs. Skinner was wearing as evidence that she was guilty. Or that they had considered the fact that it was raining as a reason to vote guilty. It's something they thought of themselves. That is, they didn't go out and do an investigation. That would be a clearer case, obviously, right? But it is in fact taking non-evidence, something extraneous, and using it to convict Mrs. Skinner. Which they cannot do, were told not to do, and did anyway.  And that this court might be concerned about encroaching on impeaching a jury verdict. You know, getting to the point where we're now going to have the juror investigation equivalent of buyer's remorse or something that we would have to deal with. And I'm very aware that that's not admissible. Well, counsel, you're an experienced defense attorney. Correct. And it will come as no shock to you, as it doesn't to me. I've been around this now for 43 years. That there are lots of defense attorneys who believe that it's a fairly routine matter for jurors not to either pay attention to that instruction or to not pay as much attention to it as they wish. Indeed, sometimes I think the instruction itself says, maybe this shouldn't be given unless defense counsel wants to give it. Which is a reflection about how defense counsel are frequently unsure whether they should even address this matter. Because jurors might not pay any attention, or the whole notion about, well, he should be testifying, I would want to testify if I were in his position. Given the fact that this is a fairly routine concern of experienced defense counsel, why wouldn't we be opening up a routine jury inquisition? Every time there's a jury verdict and a defendant hasn't testified, well, by God, we're going to find out whether some jurors thought that I would have testified and I held it against them, and therefore we're going to perhaps impeach juror verdicts. Close it. Well, I recognize that that's a concern. And that's why I said that the line is a difficult one to draw. But for whatever it's worth, Your Honor, I do a fair amount of post-conviction work and have interviewed lots of jurors  I just want to tell you that, and never had this happen, where jurors have said, we knew we were instructed not to do it, and we considered it affirmatively against her. Wait, wait, wait. I mean, you're asking me regarding experience. Nobody said that. We knew, we totally disregarded the instruction, and we affirmatively held it against her. These statements are more nuanced than that. It makes your eyebrows bob, and you're saying this isn't what juries ought to be talking about. Correct. No question about that. All of us know that. But it's a lot different than the way that you phrased it. Well, Diane Hughes stated in her statement that the jury affirmatively held Mrs. Skinner's alliance against her, that it definitely factored into the decision. And that particular juror was the one that the trial judge below, the post-conviction trial level judge, found most troubling. I think that was the word that he used. So you're right, Justice Connect. I'm saying it in a more affirmative way than the jurors did, but I'm just saying for whatever it's worth, as an experienced lawyer, this is uncommon. How about if the word had come out that the juror had said, well, you know, I think it's proof beyond a reasonable doubt. I think if it's 51%, that's enough. Yeah, I see what your point is. I wish I could tell you that this is pretty fundamental. Hey, this is pretty fundamental stuff. We all know 51% isn't proof beyond a reasonable doubt. That's what the jurors said. Out it goes. Let's do it again. I understand what your concern is, but this is a different matter, I believe. And absent any kind of evidentiary hearing where this could be aired, and what was discussed, exactly how it was discussed, what impact it had on the jurors could have been viewed by the post-conviction judge, I am asking you to draw a line here. Hasn't the line been drawn by the Supreme Court of Illinois and the prior case law saying that the discussions among jurors, if they don't involve extraneous facts like going out and investigating, aren't admissible and can't be used to impeach their verdicts? Hasn't that been a policy determination made by the Supreme Court? It absolutely has. And that's why I go back to what I said to your Honor earlier, which is, you know, the question is how one defines extraneous facts. Just some other example. I gave you just one. How about another example? Well, you know, I wasn't sure about this case. But, you know, I didn't like that lawyer, Andrea Lyon. She really upset me. Guilty. I've heard that before. Well, but I mean, you know, is that now? I mean, literally, if we're opening up this whole business to juror evaluations, were there improper considerations? You would say, hey, you can't convict a defendant because you didn't like the lawyer. And I'd say, well, I think that's true. So therefore, are we going to now open up that bag of worms as well and find some juror after the fact who might say such a thing and therefore attack that verdict? Would that be any worse than what we have here? Well, in my view, it would be. Why? Because the difference is because we're talking about a bedrock constitutional right here. And the bedrock constitutional right is the right to remain silent and to not have it held against you. Okay. The 51% reasonable doubt, that's a bedrock constitutional right too? It is, Your Honor. And, you know, I understand exactly what this court's concern is. And I understand that we are looking at something that is somewhat uncharted territory. But I also feel that given that we are talking about a bedrock constitutional right, we do have another juror who is essentially testifying, you know, that he knows everything about guns and everyone should listen to him. What did he even say that was damaging? Assuming that was even the case, I'm not sure what he could have said in the jury room that was somehow prejudicial to your client about this case. I understand exactly what you're saying, Your Honor. What I'm saying to you here is that the question for this court is whether this kind of consideration within the jury room can be, is a matter that is subject to an analysis for juror misconduct or not. And believe me when I say I would be, you know, intellectually disingenuous if I were to say I was giving you an easy problem to solve. Because it is troubling to anyone, including the trial judge below, that, you know, that a jury is saying we're, you know, essentially we're going to ignore what you told us. And she didn't testify and that put it over for us. And, you know, I was in these jurors' living rooms, some of them, and, you know, I think that the court would have been even more troubled had he heard from them than simply relying on the affidavits. And so the question this court has to answer is whether or not such a concept is cognizable. And if it is, shouldn't we have an evidentiary hearing? What affidavits are you talking about? I thought these were interview notes that were taken by the students and the witness then said, yeah, those are okay, and signed them at the bottom. That's correct. Is that an affidavit? They were not affidavits by the jurors. They were affidavits by the, I beg your pardon, they were notes that were signed by the jurors or either written by the jurors. Some of them wrote them themselves. And then the students notarized that they were present when they were signed because I believe that that's what we needed to do for the rule. Right. But I'm talking about the paraphrase of language, the summary of language. Mr. Parks says, yeah, I talked about my expertise on guns. Well, is that what Mr. Parks said or did he say, yeah, I know about guns? And the interviewer said I talked about my expertise on guns and I don't know what that means anyway. Would it have been improper for him to say, I fired one of these guns one time and I got pinched? Would that be, does anybody care that he would have said that? That, it would depend on exactly what he said and whether he was arguing. I fired a gun like that and I got pinched because that's the way the mechanism works. What effect would that have had on this trial? It would be difficult to, if that was my only claim, Your Honor, to argue that this was sufficient prejudice. Not the poison. What effect at all? If you had jurors who weren't certain if she fired the gun, I suppose it would have a big effect because there was a mark on her wrist. What about the idea, and I think this is an IPI instruction, about we tell the jurors and we expect the jurors that as you undertake this position of being a trier of fact, you may consider your common experiences in life. Correct. Well, guns are a fairly common experience. A lot of people have guns and have used guns. A lot of people have had other experiences. Maybe you've been a nurse or had CPR training or all kinds of different things. And why isn't it the case, and shouldn't be the case, that you take these people as you get them? That is, in fact, a jury instruction. And the question is, how far does that go? And I believe we used an analogy in our brief regarding if a physician was on the jury and disagreed with or had a different way of interpreting medical evidence, would that be okay or not? Would we allow him to essentially testify to his expertise? And so, again, it's a question of line drawing. I see that I'm almost out of time here. Okay. Go ahead. And so I'd like to reserve some time for… Well, you get it automatically. You get another five minutes. Oh, I do? All right. I'll wait until it gets red. Okay. I didn't know. On the first district, that means go sit down quick. Right. I understand. You're losing all your time. And so, you know, what I'm asking this court to do is to consider the totality of these circumstances. That you have an attorney who didn't do the most basic of investigations, did not account for, and the trial judge did not account for in any kind of way, the fact that Mrs. Skinner said she shot him right away and had all the indications to support a defense of self-defense, defense of dwelling, et cetera, were there. And that when you add that in with these very troubling issues regarding the jury, that Mrs. Skinner should get a new trial or at the very least an evidentiary hearing. Okay. Thank you, counsel. Ms. Brooks. May it please the court. Counsel. Counsel. My name is Anastasia Brooks, and I represent the court in this case. First of all, I'd like to talk about the defense first issue, which is the issue with respect to jurors' misconduct and the application of Elmer's Rule of Evidence 606B. The controlling cases on this issue in the state's opinion is Pitts and Barger and Hobley decisions of the screen. Now, they don't deal with precisely the same context. However, they were close enough to apply the same general rule with respect to prohibition on impeaching juror verdicts and requiring that the information be extraneous in order to be admissible. And in Pitts and Barger and Hobley were both cases in which dismissals were affirmed without an evidentiary hearing. In other words, if there is no admissible evidence because of the application of Rule 606B, then therefore there is nothing to have an evidentiary hearing on. The petition would not survive the motion to dismiss. So it's not the case where an evidentiary hearing needs to be held, like the defense suggests, in order to determine what was actually said in the jury room. So it's your position that at an evidentiary hearing none of this would be admissible? Correct, Your Honor. The evidentiary hearing in the Post-Conviction Hearing Act is not for the purpose of holding an inquiry into what was actually said in the juror room and whether it would be extraneous or not. It's the defense's burden to show that there was violation of constitutional rights. And they can't do that without having admissible evidence in support of their petition. So therefore there are Hobley and Pitts and Barger cases that show that if it's not extraneous, it does not get to an evidentiary hearing. So if a juror brought in an article that said DNA evidence was not reliable and a couple of the jurors read it, and that played a part in their decision, not in this case, but a case where DNA was, and then you got an affidavit from a juror that said, I was swayed by the article that Juror Lyons brought into the jury room, and I knew she shouldn't have brought that in, but she did. But she brought in an outside influence. That would be different, wouldn't it? Or would it? Yes, Your Honor, it would be different because the appellate court case relied on, by defense, if I can get the name of that, to make sure that was the name, Wilmer. The cases are usually in two classes. Cases in which, like here, where it's just the jurors amongst themselves discussing matters that were within the scope of the trial, like what they learned, the defendant didn't testify, the defense did not present evidence, was in fact learned from their sitting in the courtroom watching the trial. That's not extraneous. That's what these appellate court cases, they're outside Illinois, say, cases like Tran and Rodriguez and Blair from Iowa. And, Your Honor, your question deals with the other class of cases in which a Bible is brought in with verses, for example, or Internet research is conducted during the trial in violation of the court's instructions. That's extraneous information? Yes, Your Honor. Visiting the crime scene in contravention of the trial court's instructions during the course of the trial. Again, that is also extraneous information. And there are some other cases, I think one from Alaska, which talks about pre-existing knowledge might be improper if it involves the specific facts of either the defendant or the crime at issue. So if the juror was, for example, an eyewitness to the crime and knew what happened, that might be considered extraneous as well. But the cases are quite consistent. If someone knows engineering or mathematics or medicine or knows about pharmacy, all those types of general knowledge, although might be specialized, does not apply specifically to the facts of the case. So someone who knows what a particular drug does from their own pharmacy training and that particular drug is an issue in the case, that's not extraneous. That's just simply pre-existing expert knowledge, which is not something that jurors can't do. Or someone who knows a lot about guns and has experience in following Justice Connect's ideas and says, hey, I fired this gun and pinched my fingers right there and left a mark? Well, maybe if they fired the defendant's gun, but a particular class of gun, no, that's just general knowledge. That is the type of pre-existing knowledge that jurors are expected to bring to the jury room. And if the defendant wants to avoid that, there are ways to avoid having the so-called expert jurors sitting in the case, and that's barred here. The defense can ask, as a juror, do you have any knowledge of guns? Have you fired a gun? Have you fired a Glock 9mm, for example? All those questions could be asked during barred hearing. Well, what about Professor Lyon's inquiry about the physician? Physicians are now called for jury service and no longer excused. So you have someone who has been selected on a jury and who says, you know, the doctor who testified on behalf of the defense, I thought some of his conclusions were suspect. I thought his analysis wasn't very sound, based on my 15 years' experience as a clinical physician. That is permissible and not subject to impeachment to the extent that adverse pre-existing knowledge, even expert knowledge and specialized knowledge, not about the particular facts of the case, however, are used in order to evaluate the evidence actually admitted at trial. So in the case, for example, Hobley, where they said no evidence was interjected in the deliberations. Well, this was a police officer who knew about police, because he was a police officer himself, and that was the juror, and he mentioned specific things about his experience and how it related to what the police officers had done in the Hobley case. Again, that was not the witness testifying to the jury. That was not considered extraneous. So it's a situation. That's finding your jurors as they come in, and this is sufficient within the, quote, common experiences. This is kind of an uncommon experience, though, isn't it? It doesn't matter exactly how common the experience is. As far as the cases go, if the pre-existing knowledge, specialized knowledge, or expertise is used to evaluate the evidence admitted at trial, it's not extraneous. And that seems to be from the interview notes no more than what happened in this case. A witness who used pre-existing knowledge about firearms to evaluate the evidence that they heard in the courtroom, and that is what we expect jurors to do, which is to bring their life experiences in order to decide the case. And so Tanner is the case that explains the rationale for this rule, protect the needs for finality, and protect deliberations from intrusive post-trial inquiry. And because there are other protections, like dealing with the violation of the court's instructions, Tanner is the type of case that recognizes the protection of jurors who can contemporaneously report the misconduct of their peers during the trial. That's relied on as a protection. I don't know that the defendant really makes this argument that the Rule of Evidence 660 should not be constitutionally applied to her because of her Fifth Amendment privilege against self-incrimination. But the courts that the state cites in its brief have rejected a claim that it is unconstitutional to apply this rule to bar testimony about jurors considering the defendant's decision not to testify at trial. So there is no bar to applying the rule. It's not unconstitutional. And the rule does bar the evidence in this particular case. And the defense argument that the jurors are somehow willfully disobeying instruction and admitting that they considered her failure to testify and present evidence as evidence of guilt, the state does not see from the excerpts that that's the case. There's no explicit mention of considering it affirmatively as evidence of guilt. Mentions were made of being disappointed that the defendant didn't try to defend herself or that the juror thought if they were accused of murder they might say something. There was a reference to factor in their decision. However, if the prosecution presents a compelling case of guilt and the defendant has nothing to say, jurors are naturally going to think that the defendant's failure to rebut the prosecution's case is a factor in their decision. That does not mean, though, that the jurors are then relying on what is impermissible, which is the defendant did not testify, therefore we presume that they are guilty. That is an improper inference, but that's not what these transcripts, these interview notes show, that they were actually relying on an inference of consciousness of guilt, for example. The factor of decision analysis might mean something different. We don't really know, but that's at least not as explicit as the defendant wants this court to believe. The fact that the so-called bedrock constitutional right is involved here. Pitsenbarger was a case where affidavits revealed improper deliberations. Those deliberations were improper, according to the Supreme Court of Illinois. There was an erroneous belief that in order to withhold the imposition of the death penalty in that case, there had to be unanimous decision and the jurors had to agree what was sufficient mitigation. And some jurors also convinced an undecided juror that the defendant had a burden in order to persuade them not to impose the death penalty, essentially turning the process upside down. Very serious problems, but again, could not be noticed because of the rule which preexisted, Rule 606B, and that was a case that had to be dismissed, regardless of what the affidavit said. Is it your position that 606B is merely a codification, although it's a Supreme Court rule, of the preexisting case law? Yes, Your Honor, it is definitely a straight codification of the preexisting law, and even then it would apply because the evidence you're hearing was the post-conviction proceedings were taking place after the effective date. With respect to the next issue, the defendant's primary argument is that, well, she confessed at the scene to first responders. How can the defense counsel get past that fact? Well, the defense did a very admirable job overcoming essentially the state's most primary evidence of guilt, the direct admission that she was the one who shot Stephen. It was on many fronts, one was relied on was her physical condition, her medical condition in history, and her emotional state at the time. But the primary element was this notion that the physical evidence and the forensics affirmatively proved that she could not have shot Stephen with a gun that was owned by Jennifer, and to show also that Jennifer was the one who had the animus against Stephen and the most motive to kill him. So that in combination created an argument that was most reasonable. In fact, perhaps her best argument for attempting to persuade the jurors to find a reasonable doubt of guilt. Well, the defense counsel argues, though, that leaving aside how good a job may have been done, there was insufficient investigation done in this case to see whether or not some other avenues could have been employed that might have been helpful. What about that, as far as people being interviewed, I guess, is the argument? Yes, Your Honor. The argument the defense made is, well, the counsel did not interview the two first responders and apparently the police chief, none of whom were actually at the scene at the time that Stephen entered the house. So they would not necessarily be able to say what had happened. For example, whether her actions would have been justified by self-defense, defense of others, or defense of dwelling. So counsel would have known that these were not eyewitnesses to the crime. However, legally, the argument goes, and this is a Chandler case, and the defendant does not cite any case contrary to Chandler to show that when an objectively reasonable decision was reached, even in the absence of an adequate investigation, the defendant's Sixth Amendment right would require finding a deficient representation in a new trial. Chandler says, if the decided course, what they refer to as Course A, if it's pursued reasonably, then counsel's reliance on particular lines of defense and exclusions of others, and I emphasize this line here, whether or not counsel investigated those other defenses, is a matter of strategy and is not ineffective. So it does not matter if counsel selects a reasonable line of defense, another competing line of defense doesn't even have to be thought of, conceived, let alone investigated. Well, let me ask it this way. This puts you in a bit of a spot, but assuming the best possible claim on what the investigation might have shown, why wouldn't that have been a good thing from the defense point of view? To interview the police chief and first responders in this very case, what about that? If your hypothetical is that the reasonable doubt defense was borderline or not sufficient to give an adequate defense, and that this other possibility would have been the best defense, which is not necessarily our case, but the argument then would be that it would have to be shown that the chosen defense was unreasonable. The fact that there might be even a better defense, I don't find a case to show that, well, the counsel admitted an even better defense, which although this Course A was reasonable, Course B would have been a little bit better, therefore the defendant received an unfair trial. Essentially, the right to effective assistance is supposed to preserve the right to a fair trial, and if counsel provides a reasonable defense, that's all the Sixth Amendment guarantees. Well, what about, what could the, maybe here's a better way to put it, what is your understanding about what the people not interviewed could have testified to, under any circumstance that might have been of assistance in this case, as far as testimony at trial or a theory that the defense counsel could have pursued? The State is not aware of what people who are not eyewitnesses to the scene would have really been able to contribute to a justification defense, and... Well, I guess we're talking about two first responders and a police chief, I guess, that people identified. So, in your sense, it's not clear what they could have added? Yes, Your Honor, and in terms of the fact that the cars left running, it doesn't seem like that would even be enough by itself to even establish a defense right to receive instructions on justification. Well, what is your inference that could be drawn or could be argued from the fact that the car was running? Well, I'm not sure exactly what the defendant's theory would be if they were arguing it, for example, in support of a request for an instruction. And this is all assuming that the defendant doesn't testify. She can decide not to. She has not even provided an affidavit. And the only other witness, Jennifer, would have pleaded the Fifth, according to her own claims. So, essentially, the only person who could have said what happened would have been the defendant, but she's not telling. So, essentially, the argument would have to be made at the instruction conference is that somehow jurors should be able to infer from the fact that the cars left running that this was somehow a smash-and-grab type of operation that Stephen was going to perpetrate. Even though he had scheduled visitation, even though there's no showing that there's any damage to the door, the fact that the time of the year, and this was approximately about Thanksgiving, I think, and the fact that he was intending on picking up his daughter for her scheduled visitation would be a most reasonable inference to think that he left the car running simply to keep it warm for his daughter, who he was expecting to receive. And if it turns out, for example, from Jennifer's 911 call, that they were going to tell him that Sidney could not go because she was sick, and he was going to learn that for the first time after he'd already left his car running and gets inside the house. And under the Sawyer case, even if he somehow pushed Shirley out of the way at that point, it's not going to mean it's a riotous and tumultuous entry, because the entry had to be effected in such a manner. And if he's already inside, and if the allegation would be that he had pushed her at that point, it's not going to entitle them to a defensive dwelling instruction. And there has to be some evidence as to every element of these affirmative defenses. And it just does not seem possible for her to show that she held any actual and subjective belief to use deadly force without having testified herself. Even if they showed circumstantially that Steven might have pushed her down, for example. I'd really like to cite an important case, this Green case. The defendant has to show that if they were to investigate, they have to allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Well, essentially all we have here alleged that what a better investigation would have revealed is that Steven's car was left running. And it can't show how that would alter the result of the trial, because it just was not an important enough fact, even to get an instruction, let alone to show that there would have been a reasonable probability that she might have been acquitted, had that fact been known. And so the fact that somehow choices are being made in a vacuum, the question is not whether the choices are strategic, and this is Robey, Flores, or Toyt, or Tega, but whether the decision was reasonable. And here the decision was most reasonable under the circumstances. So the fact that the allegation here is that a failure to investigate, counsel can make an objectively reasonable decision even without enough information. The focus is on the reasonableness of the decision actually reached, not on the process of reaching that decision. So it's even possible more investigation in many cases can confirm the decision that counsel actually reached. So there is no per se rule that a counsel who fails to make enough investigation in order to make trial-tactical type decisions does not absolve them of the defensive responsibility of showing that there was in fact an objectively unreasonable performance and prejudice.  So for those reasons, I would entertain other questions. Otherwise, I would request this Court to confer. Thank you. Thank you, counsel. Ms. Lam? First of all, one comment on the reliance on Hobley. Hobley actually in fact was reversed and remanded for an evidentiary hearing, and Hobley was ultimately exonerated and is free right now. And I would know because I was his lawyer. So I just wanted to point that out. Regarding the ineffective assistance of counsel and the failure to investigate claim, a failure to investigate is only reasonable if reasonable inquiries tell you not to go down a particular path. However, there is a big elephant in the room that the trial judge didn't talk about, and that is not mentioned by my opponent here, and that is actually Shirley Skinner did testify. She said, I shot him. Is he dead? He shouldn't have come in here. She was bleeding and hysterical, all of which are enough, if presented properly, to get the instruction on self-defense or defense of dwelling. Am I telling you that the car running alone by itself would be enough? No, it's not. But I can tell you exactly what the opening statement of this case should have been. The opening statement of this case should have been, there was a contentious divorce here and a contentious custody battle, and Mr. Watkins had had enough, pushed his way into their home, knocked this nearly octogenarian great-grandmother across the room into a wall stance which broke, cutting her hand, pushed her out of the way, and she shot him in self-defense and defense of dwelling. That should have been the opening statement. And if there had been any evidence supporting any of it, it would have been persuasive. But there is. What is it? It's what she said to the first responders. There's the fact that the car is open, it was running, which is an indication or certainly a circumstance that one could argue. Here the prosecutor gets up here and argues how the fact that it was Jennifer's gun and Shirley Skinner's DNA wasn't on the gun, it was reasonable to argue to the jury that therefore Shirley didn't do the killing, which by the way was not argued in this case. What I'm saying to you, Your Honors, is this. Wiggins v. Smith and Taylor v. Williams and the whole plethora of cases that have followed since Strickland that talk about what is reasonable are asking Strickland to actually be applied. And Strickland requires a reasonable investigation. It doesn't require that you do everything. Let me ask you a question about that. And I'm confused about this. Did the interview, did the affidavits provided by these two first responders, and there's multiple first responders, right? These are the very first two. Is there anywhere in that affidavit or anywhere in the record that says they were interviewed by Mr. Lipsky? Yes. Where? They say that they've never been interviewed. It's right in the affidavit. It's in the affidavit? Yes, it is. Okay. What in their affidavits substantiates or would assist in self-defense or defensive dwelling? The condition in which they saw her, the injury that they saw, which was inadequately preserved. I don't know if you remember all this from the record. No photograph of the family. Right, no photographs, no photograph of scots, no nothing, which I would have been in there with a camera the next day. But anyway, whatever. And that her physical condition, all of these things tend to support this. Did that come in in another way, though? Some of it did. Some of it did not because some of it they didn't know to ask the question because they didn't interview the witnesses and didn't know they had this information and it wasn't in a police report. So where does the wall sconce come in? The wall sconce was testified about. It went to trial. It was testified about, yes. And that's supposed to be the evidence of knocking against the wall or being thrown, thrust against the wall. That is evidence that supports what she said to the first responders, yes. But that comes in anyway. Yes, it does, but it's not. In the trial, is there any connection between that wall sconce and the theory of the defense? No. Because for all the reasons I've talked about before. So again, I want to close the way that I opened, which is to say I understand that this court cannot demand a perfect trial. But we are talking literally about the rest of this young woman, the rest of this young woman's life. And this wasn't a fair trial. And she deserves that. And I ask that you reverse the court law. Thank you, counsel. We'll take this matter into the rise for the meeting.